**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**HODGES and PIPKIN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**May 1, 2025**

# In the Court of Appeals of Georgia

A25A0144. UBER TECHNOLOGIES, INC. v. O'CONNELL, IN HIS OFFICIAL CAPACITY AS REVENUE COMMISSIONER OF THE STATE OF GEORGIA.

HODGES, Judge.

Uber Technologies, Inc. appeals from a superior court order affirming the Georgia Tax Tribunal's ruling that Uber is liable for approximately $9 million in sales tax it failed to collect between 2012 and 2015 (the "audit period"). Uber argues that it is an online marketplace that does not furnish taxable transportation services, and the trial court erred in applying a "headquarters operators" amendment in a taxicab regulation to find that Uber was required during the audit period to collect sales tax from its independent drivers and remit that tax to the Georgia Department of Revenue. Uber further argues that requiring it to collect sales tax discriminatorily

shifts the sales tax collection obligation in violation of the federal Internet Tax Freedom Act ("ITFA"). Because we conclude that the applicable statutory scheme required Uber to collect sales tax for the time period at issue here, we affirm the superior court's order.

1. *Facts.* The underlying facts are not disputed. Uber began doing business in Georgia in July 2012. Uber is a technology company operating mobile application-based platforms that utilize proprietary algorithms to connect consumers seeking transportation services ("riders") with independent transportation service providers ("drivers"). The Uber apps are designed, maintained, and operated by employees at Uber's San Francisco, California, headquarters. During the audit period, Uber maintained an Atlanta office where employees typically worked on operations teams that oversaw the marketplace. Uber also maintained a "Partner Support Center" — a technical support center where workers helped drivers create accounts, update insurance information, and return lost rider items — in Georgia.

The apps connect riders and drivers via an online marketplace; information is sent through the cloud and servers outside the state of Georgia. To provide riders with accurate information concerning nearby Uber drivers, the Uber app collects and stores

GPS points from drivers' devices "every couple of seconds." Riders and drivers download the Uber apps for free, but drivers pay Uber a fee for its services, which include connecting drivers through lead generation, enabling drivers to receive and fulfill rider requests for transportation services, acting as a collection agent on behalf of the drivers, and providing related support services. Both riders and drivers enter into agreements with Uber and its affiliates to use the Uber apps. The driver's agreement includes various requirements, the violation of which could result in denial of access to the app. Some drivers in Georgia have been deactivated by Uber for failing to abide by Uber's policies.

Riders use the Uber app to see local driver availability and select from several transportation options with estimated prices. Once a rider chooses an option, the driver associated with the transportation option, based on proximity to the rider, is offered the ride and can accept or decline the ride. Uber does not provide riders with specific drivers or assign drivers to specific riders. In addition, Uber does not set schedules for drivers, require any given or minimum amount of drive time, or control how drivers provide transportation. Uber provides ride request information only when drivers are logged on to the driver app; if a driver accepts a ride request, then the

3

driver sees the pickup location of the rider and the rider sees the location of the driver through the GPS functionality of the Uber apps. Until July 1, 2015, drivers' vehicles were not required to display any particular signage identifying the ride share network service as Uber.

Riders pay drivers a base fare for transportation services calculated using the riders' location and type of transportation service requested, plus a variable amount based on the distance traveled and the time of the trip. During the audit period, Uber "would have originally collected the money on behalf of the driver" by charging the rider's credit card at the end of the ride, then the monies would have flowed to an Uber subsidiary which would have remitted payment to the driver minus the service fee owed by the driver. The service fee paid by a driver is calculated as a percentage of the fare the rider paid the driver and fluctuates depending on the market location and type of transportation offered.

2. *Procedural posture*. The dispute at issue in this case began in 2018, when the Compliance Division of the Georgia Department of Revenue (the "Department") sent Uber an "Official Assessment and Demand for Payment" for approximately $22,000,000 in unpaid sales tax and penalties during the audit period: July 23, 2012

through June 30, 2015. Uber admits that it did not collect sales tax from riders in Georgia during the audit period, claiming it relied on drivers to collect any sales tax owed. Nonetheless, Uber timely protested the assessment, asserting it was not required to collect sales tax.[1] The Department denied the protest, and Uber appealed to the Georgia Tax Tribunal.

In May 2022, the Tax Tribunal upheld the assessment, ruling that Uber was responsible for collecting sales tax from its independent drivers under a regulation entitled "Taxicabs," Ga. Comp. R. & Regs., r. 560-12-2-84 (the "Taxicab Regulation"),[2] as Uber's app-based business model functioned in the same way as a traditional taxicab headquarters. Thereafter, the Tax Tribunal entered a final order, setting the amount of the assessment at $8,926,728.44.

Uber sought judicial review of that order in the superior court under OCGA § 50-13A-17. The superior court subsequently issued an order denying Uber's petition

---

[1] Certain Uber subsidiaries are required by law to collect sales tax in Iowa, New York State, New York City, Rhode Island, South Dakota, Wyoming, and Juneau, Alaska.

[2] The superior court refers to the regulation as the "HQ Regulation" while Uber, the Revenue Commissioner, and Metro Atlanta Chamber in its amicus curiae brief refer to the regulation as the "Taxicab Regulation."

for judicial review and affirming the order of the Tax Tribunal. We granted Uber's application for discretionary appeal, and this appeal followed.

3. *Statutory scheme and standards of review.* In 2012, the General Assembly created the Georgia Tax Tribunal to be "an independent specialized agency separate and apart from the Department of Revenue to resolve disputes between the department and taxpayers in an efficient and cost-effective manner." OCGA § 50-13A-2, enacted by Ga. L. 2012, p. 318, § 15. A party may appeal a final decision of the Tax Tribunal to the Superior Court of Fulton County. OCGA § 50-13A-17 (a), (b). When reviewing an appeal from the Tax Tribunal, the superior court defers to the tribunal's factual findings and "shall not substitute its judgment for that of the tribunal's as to the weight of the evidence on questions of fact." OCGA § 50-13A-17 (g). However,

> all questions of law decided by a court or the Georgia Tax Tribunal, including interpretations of constitutional, statutory, and regulatory provisions, shall be made without any deference to any determination or interpretation, whether written or unwritten, that may have been made on the matter by the [D]epartment [of Revenue] . . . .

OCGA § 48-2-59 (e); see Ga. L. 2021, pp. 120, 121-122, § 3.

This Court reviews de novo "both claimed errors of law in the superior court's appellate review and any interpretation of a statute or agency regulation." *Exec. Limousine Transp. v. Curry*, 361 Ga. App. 626, 628 (865 SE2d 217) (2021).

4. *Statutory construction*. The superior court's decision in this case is based on an agency regulation. Administrative regulations, properly enacted under a delegation of legislative authority, have the same force and effect as statutes. *Dallas Blue Haven Pools v. Taslimi*, 180 Ga. App. 734, 736 (1) (350 SE2d 265) (1986); accord *Ga. Real Estate Comm. v. Accelerated Courses in Real Estate*, 234 Ga. 30, 32 (2) (214 SE2d 495) (1975) (finding that duly-enacted regulations are presumed valid and may only be disturbed where the court finds they either lack statutory authorization or are unreasonable). In construing a regulation, as with a statute, we must construe the regulation as written, looking to its text. *Grand Canyon Ed. v. Ward*, 358 Ga. App. 412, 417 (855 SE2d 415) (2021); accord *Grange Mut. Cas. Co. v. Woodard*, 300 Ga. 848, 857 (2) (b), n. 8 (797 SE2d 814) (2017). "[W]e must presume that the [administrative agency] meant what it said and said what it meant." (Citation and punctuation omitted.) *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013). In other words, "we must afford the [regulatory] text its plain and ordinary meaning, we must

7

view the [regulatory] text in the context in which it appears, and we must read the [regulatory] text in its most natural and reasonable way, as an ordinary speaker of the English language would." (Citations and punctuation omitted.) Id. a 172-173 (1) (a). That being said, we also "look to the stated purpose of the regulation, as well as the broader regulatory context of which it is a part." (Citation and punctuation omitted.) *Wells Fargo Clearing Svsc. v. Leggett*, 365 Ga. App. 8, 13 (1) (a) (876 SE2d 888) (2022).

It is the role of the judicial branch in applying these principles to interpret statutes and regulations. *Handel v. Powell*, 284 Ga. 550, 553 (670 SE2d 62) (2008). "[I]f the statutory text is 'clear and unambiguous,' we attribute to the [regulation] its plain meaning, and our search for [regulatory] meaning is at an end." *Deal*, 294 Ga. at 173 (1) (a). While Georgia jurisprudence historically has given judicial deference to agency interpretations of its own regulations, our Supreme Court has cautioned that "we are to defer to an agency's interpretation only when we are unable to determine the meaning of the legal text at issue." *City of Guyton v. Barrow*, 305 Ga. 799, 802 (2) (828 SE2d 366) (2019). In short, "[t]he judicial branch makes an independent determination as to whether the interpretation of the administrative agency correctly reflects the plain language of the statute [or regulation] and comports with the

8

legislative intent." (Citations and punctuation omitted.) *Handel*, 284 Ga. at 553. An agency's interpretation of a regulation is only entitled to deference if the regulation is ambiguous, and, according to the Supreme Court, "[a]fter using all tools of construction, there are few statutes or regulations that are truly ambiguous." *Barrow*, 305 Ga. at 804 (2). "A statute or regulation is not ambiguous merely because interpreting it is hard." Id. at 803 (2).

5. *Relevant tax law.* To determine whether Uber was required to collect sales tax during the audit period, we turn to the relevant tax law. Georgia's Sales and Use Tax Act (the "Sales Tax Act"), enacted in 1951, defined "retail sale" broadly to mean "a sale to a consumer or to any person for any purpose other than for resale in the form of tangible personal property, or services taxable under this Act, and . . . any such transactions as the State Revenue Commissioner upon investigation finds to be in lieu of sales[.]" See Ga. L. 1951, p. 360, 364, § 3 (c) (1). That term consistently has remained broad, and the current statute defines "retail sale" to mean any sale, lease, or rental for any purpose other than for resale, sublease, or subrent." OCGA § 48-8-2 (31) (2010). Since the Sales Tax Act was enacted, the sale of transportation has always been considered taxable as "retail sale." See Ga. L. 1951, p. 360, 364, § 3 (c) (1) (a);

OCGA § 48-8-2 (31) (A) (2010). In fact, this Court previously has noted, "the sale of transportation by hired car has been subject to sales tax ever since that tax's introduction into Georgia law, and all taxpayers who own, operate, or direct such vehicles are responsible for collecting and remitting sales tax." *Curry*, 361 Ga. App. at 631 (1).

The General Assembly has included the following declaration regarding the Sales Tax Act:

> It is the intention of the General Assembly in enacting this article to exercise its full and complete power to tax the retail purchase, retail sale, rental, storage, use, and consumption of tangible personal property and the services described in this article except to the extent prohibited by the Constitutions of the United States and of this state and except to the extent of specific exemptions provided in this article.

OCGA § 48-8-1. "This expansive language in favor of taxation is in accordance with the maxim that 'taxation is the rule, and exemption from taxation the exception.'" (Citation omitted.) *Curry*, 361 Ga. App. at 629-630 (1). In that vein,

> [e]xemptions are made, not to favor the individual owners of property, but in the advancement of the interests of the whole people. Exemption, being the exception to the general rule, is not favored; but every exemption, to be valid, must be expressed in clear and unambiguous

terms, and, when found to exist, the enactment by which it is given will not be enlarged by construction, but, on the contrary, will be strictly construed.

(Citation and punctuation omitted.) Id. at 630 (1).

According to the Sales Tax Act, "[t]he tax shall be paid by the person purchasing or receiving the service to the person furnishing the service." OCGA § 48-8-30 (f) (1). However, the Department in this case asserts that Uber was required to collect sales tax during the audit period under the Taxicab Regulation, Ga. Comp. R. & Regs., r. 560-12-2-84. The regulation was promulgated in 1965 and amended in 1983 and 1991. Id. Uber does not dispute that the most recent 1991 version applies in this case or that the "headquarters operators" amendment became effective in 1991. The Taxicab Regulation contains seven numbered sections allocating responsibility for the collection of sales tax on fares for transportation of persons and remittance of the collected tax to the State Revenue Commissioner depending on various ownership or operational scenarios. For example,

[a]n owner and operator of a cab collects the tax on fares and remits it to the State Commissioner; one who leases or rents a cab from another who supervises his operations collects the tax and pays it to his lessor, who remits it to the State Commissioner; one who leases a cab which is

11

partially operated by both the lessor and lessee collects the tax and remits it to the lessor for remittance to the State Commissioner; a cab driver who operates out of a headquarters for cabs, is supervised or directed by the headquarters operator or receives relayed calls from the headquarters operators collects the tax and pays it to the headquarters operator who remits it to the State Commissioner. An "independent" taxicab driver collects the tax and remits it directly to the State Commissioner.

*Collins v. Adams Cab*, 261 Ga. 305 (1), n. 1 (404 SE2d 560) (1991).

As relevant to the issue before us, the Taxicab Regulation provides as follows:

(4) Taxicab "headquarters" operators. Any person operating a headquarters for taxicabs and supervising or directing taxicab drivers, or receiving and relaying calls to cab driver members, shall register as a dealer. Cab driver members operating from such headquarters shall pay the tax at the time of purchase, lease or rental, on all tangible personal property used or consumed in the operations. Additionally, such drivers shall collect the tax on fares for transportation of persons in accordance with the uniform bracket system and pay the same to the dealer operating the headquarters for remittance to the State Revenue Commissioner.

. . .

(6) Cars for hire. For the purpose of this regulation, cars for hire are taxable in the same manner as taxicabs.

(7) Definitions.

(a) For purposes of this regulation the term "independent taxicab operator" means a person who is totally unassociated with any headquarters operation and with any lessors of taxicabs and with any other taxicab business or driver.

(b) Due to the likelihood that the State would otherwise lose tax funds due to the difficulty of policing the business operations of taxicab drivers because of the nature of the business, the lack of an office or regular place of business and the turnover of drivers, headquarters operators and lessors of taxicabs shall collect the tax on fares for transportation of persons from their drivers as required above, and the term "headquarters operators" includes not only any person operating a headquarters for taxicabs and supervising or directing taxicab drivers, or receiving and relaying calls to cab driver members, but also any person or entity allowing use of the trade name of the headquarters or allowing any driver to hold himself out as being associated with the headquarters. The term "taxicab lessors" includes any person or entity leasing a

vehicle to another person or entity for use as a taxicab.

Ga. Comp. R. & Regs., r. 560-12-2-.84. In short, under the Taxicab Regulation, cars for hire are required to collect sales tax on fares for transportation of persons, and whether that tax is remitted directly to the State Revenue Commissioner or to a

headquarters operator (who then must remit the tax to the State Revenue Commissioner) depends on whether the car for hire has an association with a "headquarters operator."

With these guiding principles, statutes, and regulations in mind, we turn to the tax issue before us. In several related enumerations of error, Uber challenges the superior court's ruling that the Taxicab Regulation required Uber to collect sales tax from Uber drivers and remit this tax to the State Revenue Commissioner during the audit period. While Uber states that "[t]his case is not about the validity of that regulation or the taxability of transportation services[,]" Uber generally implies throughout its appellate brief that the Taxicab Regulation's underlying statutory authority is insufficient to apply the regulation to Uber. Accordingly, we necessarily begin our analysis with a review of the validity of the Taxicab Regulation before determining whether that regulation applies to Uber. In doing so, we note at the outset that (i) Uber's statutory authority renumbering argument is incorrect because the legislative history shows that OCGA § 48-8-2 (31) (E) is *not* the successor to OCGA § 48-8-2 (6) (B), and (ii) the as-applied validity of the Taxicab Regulation has already been recognized, or at least impliedly recognized, in appellate decisions.

6. *Validity of the Taxicab Regulation.* As stated previously, the Taxicab Regulation at issue in this case was adopted in 1965 and amended in 1983 and 1991. Ga. Comp. R. & Regs. r. 560-12-2-.84. Complying with OCGA § 50-13-6 (a),[3] the regulation lists the following "citation of the authority pursuant to which it was adopted": Ga. L. 1937-1938, Extra Sess., p. 77, et seq. as amended (Ga. Code Ann. §§ 92-8405, 92-8406, 92-8409, 92-8427) (providing for an integrated tax administration for Georgia, creating the Department of Revenue, p. 79, § 2, and vesting with the State Revenue Commissioner "all of the power and authority [] required to perform all of the duties relating to matters of taxation"[4]), p. 80, § 4; Ga. L. 1951, pp. 360, 385, § 21 (Ga. Code Ann., § 92-3438a) (creating an Act authorizing the levy and collection of retailers and consumers sales and use tax, as well as vesting the State Revenue Commissioner with "the power to make and publish reasonable rules and regulations not inconsistent with this Act or the other laws, or the Constitution of this State or the

---

[3] That statute requires every rule adopted after July 1, 1965 to "contain a citation of the authority pursuant to which it was adopted and, if an amendment, . . . [to] clearly identify the original rule."

[4] *Royal Indem. Co. v. Mayor &c. of City of Savannah*, 209 Ga. 383, 388 (1) (73 SE2d 205) (1952) (noting the legislative history and the State Revenue Commissioner's authority with respect to taxation).

United States, for the enforcement of the provisions of this Act and the collection of revenues hereunder"); [5] OCGA § 48-2-12 [6] (authorizing the Department of Revenue Commissioner to make reasonable rules and regulations for the enforcement and collection of revenues under Georgia's Revenue and Taxation Act); and OCGA § 48-8-2 (6) (B) (defining "retail sale" for purposes of Georgia's Sales Tax Act to include transportation).

(a) *Statutory authority renumbering.* Uber argues — and the superior court adopted the argument — that the Taxicab Regulation was promulgated under a principle currently codified at OCGA § 48-8-2 (31) (E), which authorizes the Department to enact regulations shifting the sales tax collection obligation from sellers of tangible personal property to resellers of tangible personal property "when there is a likelihood that the state will lose tax funds due to the difficulty of policing the

---

[5] See *Eimco BSP Svcs. Co. v. Chilivis*, 241 Ga. 263, 267, n. 3 (244 SE2d 829) (1978) (reciting Ga. Code Ann § 92-3438a).

[6] The regulation erroneously refers to OCGA § 430-2-12, a Code section that has never existed in Georgia, instead of OCGA § 48-2-12. A review of other regulations within the "Sales and Use Tax Division" rules, however, shows the consistent use of OCGA § 48-2-12 as the primary source of authority in other tax rules, and Uber does not dispute that OCGA § 48-2-12 is, in fact, the applicable statute for this regulation.

business operations[.]" Specifically, Uber states that "OCGA § 48-8-2 (6) (B) was renumbered as OCGA § 48-8-2 (31) (E)." That is incorrect. The legislative history shows that OCGA § 48-8-2 (6) (B) was in fact renumbered as OCGA § 48-8-2 (31) (A) (defining "retail sale" to include the sale of, among other things, transportation).

When the original statute authorizing the levy and collection of a general retailers and consumers sales and use tax was promulgated in 1951, it defined "[r]etail sale" to include "[t]he sale of . . . transportation[.]" Ga. L. 1951, p. 360, 364, § 3 (c) (1) (a). In 1978, this principle was codified at Georgia Code § 91A-4501 (f) (2). Ga. L. 1978, p. 309, 311, § 2; see also Ga. L. 1979, pp. 5, 74-77, § 83; Ga. L. 1980, pp. 10, 25, § 22. In 1981, the Georgia Code was revised, see Ga. L. 1981, Extraordinary Sess., pp. 8-9, and Ga. Code § 91A-4501 (f) (2) (1980) was recast as OCGA § 48-8-2 (6) (B) (1982). When the Taxicab Regulation was amended in 1983 and 1991, the principle codified at OCGA § 48-8-2 (6) (B) defined "[r]etail sale" to include "[t]he sale of . . . transportation[.]" See OCGA §§ 48-8-2 (6) (B) (1982) and 48-8-2 (6) (B) (1990). That was one of the statutory authorities on which the Taxicab Regulation was adopted and subsequently amended. The principle was renumbered as OCGA § 48-8-2 (31) (A) in 2010, see Ga. L. 2010, p. 662, 670, § 1, where it currently remains.

The tangible personal property principle currently codified at OCGA § 48-8-2 (31) (E) was initially codified at Ga. Code § 91A-4501 (f) (7). See Ga. L. 1978, p. 309, 608, § 2 and p. 1664, § 1; see also Ga. L. 1979, p. 5, 76, § 83. The principle was codified at Ga. Code 91A-4501 (f) (7) (1980) when the Georgia Code was revised in 1981, see Ga. L. 1981, Extraordinary Sess., pp. 8-9, and subsequently codified at OCGA § 48-8-2 (6) (G) (1982). The tangible personal property principle codified at OCGA § 48-8-2 (6) (G) remained at that subsection at the time the Taxicab Regulation was amended in 1983 and 1991. See OCGA §§ 48-8-2 (6) (G) (1982) and 48-8-2 (6) (G) (1990). In fact, it remained at that subsection until it was renumbered to OCGA § 48-8-2 (31) (E) in 2010, see Ga. L. 2010, p. 662, § 1, where it currently remains. See *Collins*, 261 Ga. at 306 (1), n. 2 (noting that the burden placed by the Taxicab Regulation "is similar to the burden placed by OCGA § 48-8-2 (6) (G) on those who sell tangible personal property to persons for resale when there is a likelihood the State will lose tax funds due to the difficulty of policing the business operations of the retailer").[7] Contrary to Uber's assertion, the tangible personal

---

[7] By comparing the Taxicab Regulation to OCGA § 48-8-2 (6) (G), now OCGA § 48-8-2 (31) (E), the Supreme Court implied that it did not consider that subsection as authority limiting the scope of the Taxicab Regulation to the resale of tangible goods, as argued by Uber, but rather as authority to reallocate the burden of collection

property principle currently codified at OCGA § 48-8-2 (31) (E) was not listed as statutory authority for the Taxicab Regulation, and its argument that any application of the Taxicab Regulation must be limited to "sales of tangible personal property to persons for resale" because the regulation relied on OCGA § 48-8-2 (31) (E) as statutory authority necessarily fails.

Nonetheless, we agree with the lower court that OCGA § 48-8-2 (31) (E) represents a legislative intent to shift the sales tax collection burden from the person furnishing the services, as required under OCGA § 48-8-30 (f) (1), to the purchaser or receiver of services when a likelihood exists that the state will lose tax funds due to the difficulty of policing the business operations. See generally *Collins*, 261 Ga. at 306 (1), n. 2. While Uber correctly points out that OCGA § 48-8-2 (31) (E) discusses tangible personal property for resale, a different type of sales taxation than transportation services, that subsection addresses the same type of tax collection problem addressed in the Taxicab Regulation. The general legislative intent to shift the sales tax collection burden when certain collection issues exist, coupled with the

---

for certain scenarios, such as when it is likely the state will lose tax funds due to the nature of the business relationship. *Collins*, 251 Ga. at 306 (1), n. 2. That implication comports with this Court's analysis of the Taxicab Regulation's statutory authority.

Department's authority in OCGA § 48-2-12 to create reasonable rules and regulations to enforce and collect revenues and the provision in OCGA § 48-8-2 (6) (B) that revenues can be collected for transportation, properly permitted the Department to adopt the Taxicab Regulation and shift the sales tax burden from the furnisher of transportation services to the headquarters of cars for hire "[d]ue to the likelihood that the State would otherwise lose tax funds due to the difficulty of policing the business operations of taxicab drivers because of the nature of the business, the lack of an office or regular place of business and the turnover of drivers[.]" Ga. Comp. R. & Regs. r. 560-12-2-.84 (7) (b).

(b) *Appellate court application.* In fact, any doubt as to the Department's authority to adopt the Taxicab Regulation has already been answered by Georgia's appellate courts. Pertinently, the Taxicab Regulation was last amended in 1991, and the collection requirement for "headquarters operators" was added at that time. After that revision, both our Supreme Court and this Court impliedly addressed the validity of the Taxicab Regulation by applying the regulation and, specifically, its "headquarters operators" amendment in cases involving taxicabs and limousines.

Immediately after the enactment of the "headquarters operators" amendment to the Taxicab Regulation, our Supreme Court enforced paragraph 7 (b) of the regulation against a taxicab company, upholding the Department's assessment that a taxicab company was responsible for collecting sales tax on behalf of all its drivers, regardless of whether the drivers were employees or contractors. *Collins*, 261 Ga. at 305-307 (1). In its opinion, the Supreme Court "recognized the need to collect the tax on fares for transportation of persons; the vital role in the collection of the tax played by the taxicab driver; and the impossibility or impracticability, due to the nature of the business operations of taxicab drivers, of the State to collect the tax from the individual drivers." *Collins*, 261 Ga. at 306 (1). The Court acknowledged that the Taxicab Regulation "placed the burden on the headquarters operators and taxicab lessors to collect the tax from the drivers for remittance to the State Commissioner." (Footnote omitted.) Id. According to the Supreme Court, "one who meets the regulatory definition of lessor or headquarters operator is in a better position to arrange with the individual drivers with whom it does business for the collection and remittance of the tax on fares than is the State, and . . . the regulation places that burden on the lessor or headquarters operator," id. at 306-307 (1), similar to the

burden placed by OCGA § 48-8-2 (31) (E) on those who sell tangible personal property to persons for resale "when there is a likelihood the State will lose tax funds due to the difficulty of policing the business operations of the retailer." *Collins*, 261 Ga. at 306 (1), n. 2.

Similarly, this Court also has considered the Taxicab Regulation and, specifically, the "headquarters operators" collection requirement in a case addressing whether "for-hire car services like [a limousine company] are subject to sales tax." (Punctuation omitted.) *Curry*, 361 Ga. App. at 628, 630 (1). Citing *Collins*, supra, we concluded that the for-hire limousine company was obligated to collect sales tax as a headquarters operator under the Taxicab Regulation for the rental of its limousines or cars. *Curry*, 361 Ga. App. at 631 (1), 633 (1). In doing so, we relied on the maxim that taxation is the rule, and exemption from taxation is the exception, and we noted that the Taxicab Regulation requires companies directing cars for hire to collect and remit sales tax. Id. at 629-631 (1). We further rejected a claim by the limousine company in that case that its drivers offered "professional" and "personal" services statutorily exempted from sales tax, concluding that the "provision of transportation is at the core of what a for-hire driver and service sells to its customers." Id. at 634 (2).

(c) *Conclusion*. We agree with Uber that OCGA § 48-2-12 does not grant the Department unbounded "plenary authority" to promulgate tax regulations. However, it does specifically give the Department commissioner "the power to make and publish in print or electronically reasonable rules and regulations not inconsistent with this title or other laws or with the Constitution of this state or of the United States for the enforcement of this title and the collection of revenues under this title." OCGA § 48-2-12 (a). And OCGA § 48-8-2 (6) (B) (1990) provides that transportation is subject to Georgia's sales and use tax. Based on the statutory authority authorizing the Department to adopt the Taxicab Regulation and case law implicitly upholding the regulation,[8] it is clear that the Taxicab Regulation is valid.

7. *Application of the Taxicab Regulation in light of OCGA § 48-8-30 (f) (1)*. Uber maintains that the Department was not authorized to expand or impose tax collection obligations not imposed by the legislature on Uber, arguing specifically that applying the Taxicab Regulation to Uber "runs afoul" of OCGA § 48-8-30 (f) (1), which

---

[8] Uber argues that *Collins* and *Curry* "have nothing to do with the issues raised in this case" because they do not address whether the Taxicab Regulation applies to "a person not selling or reselling transportation services." We disagree. Both cases applied the "headquarters operators" amendment to the regulation and offer guidance as to whether the Taxicab Regulation applies to Uber.

requires sales tax to be "paid by the person purchasing or receiving the service to the person furnishing the service." Uber claims that it was not required to collect sales tax during the audit period because it did not "furnish" taxable services, but was merely a "marketplace platform"/"ride share network service" acting as a conduit through which drivers furnished the taxable service of providing transportation, and companies that do not furnish taxable sales have no obligation to collect sales tax under OCGA § 48-8-30 (f) (1).[9]

Regardless of whether Uber "furnished" transportation services under the Act during the audit period, the statutory language and case law cited above demonstrate that the Department possessed the authority to enact the Taxicab Regulation and shift the sales tax *payment* burden from the individual driver *furnishing* the transportation service and *collecting* the sales tax to the "headquarters operators," who are responsible for collecting the sales tax from the individual drivers and paying it to the

---

[9] Uber asserts that its company should be likened to online travel companies that are not responsible for collecting sales tax because they do not furnish hotel rooms. However, there is a big distinction between the two. A consumer can still rent a room directly through the hotel itself or some other means than the intermediary online travel company. An Uber rider, on the other hand, can *not* receive an Uber ride without utilizing the Uber app. In this respect, online travel companies represent an entirely situation subject to a different tax scheme.

State Revenue Commissioner. Ga. Comp. R. & Regs. r. 560-12-2-.84 (4), (7) (b). Contrary to Uber's assertions, the Department is not expanding the scope of OCGA § 48-8-30 (f) or "impos[ing] a new tax." The Department is simply using its authority to enforce and collect sales tax by ensuring that the party best positioned to collect the tax is required to do so. As stated previously, "the sale of transportation by hired car has been subject to sales tax ever since that tax's introduction into Georgia law, and all taxpayers who own, operate, or direct such vehicles are responsible for collecting and remitting sales tax." *Curry*, 361 Ga. App. at 631 (1). The Taxicab Regulation provides an exception to the default collection and payment method found in OCGA § 48-8-30 (f) (1), and this Court has applied the collection and payment shift to cars for hire. Accordingly, whether Uber "furnished" services is irrelevant if the Taxicab Regulation applies to it. We therefore turn to that argument.

8. *Application of the Taxicab Regulation to Uber*. Uber asserts that the superior court exceeded its authority in applying the Taxicab Regulation to Uber because the regulation "was intended to apply to a specific, heavily regulated industry (taxicabs), as that industry was understood at the time." To support this argument, Uber takes a narrow view of the term "headquarters," asserting that the Taxicab Regulation does

25

not address the operations of online marketplaces, ride share network services, or technology service providers, like Uber, because an online app is not an office or physical space and has never been deemed to be a "headquarters." We decline to adopt Uber's arguments.

(a) *Regulation application*. We first address Uber's assertion that the term "headquarters operators" was not meant to apply to companies like Uber, which began transportation services well after the 1991 amendment to the Taxicab Regulation. Though the Taxicab Regulation was adopted years before ride share network service providers like Uber came into existence, this does not mean the regulation cannot apply to such "cars for hire." The Taxicab Regulation specifically provides that "[f]or purposes of this regulation, cars for hire are taxable in the same manner as taxicabs." Ga. Comp. R. & Regs. r. 560-12-2-.84 (6). Uber does not contest that its drivers provide cars for hire. In addition, this Court previously has referred to Uber as a "for-hire car compan[y]." *Curry*, 361 Ga. App. at 627, n. 1. Indeed, as discussed more fully below, there is no language in the Taxicab Regulation or its stated policy rationale that prevents the regulation's plain language from applying to Uber

just as easily as it applies to taxicabs and limousines. Uber's arguments regarding the regulation's sole applicability to the heavily-regulated taxicab industry lack merit.[10]

(b) *Definition of headquarters*. We next address Uber's argument that it cannot be considered a "headquarters operator." The Taxicab Regulation does not specifically define "headquarters," but it does define "headquarters operators" broadly to include

> not only any person operating a headquarters for [cars for hire] and supervising or directing [cars for hire] drivers, or receiving and relaying calls to [cars for hire] driver members, but also any person or entity allowing use of the trade name of the headquarters or allowing any driver to hold himself out as being associated with the headquarters.

---

[10] We further disagree with Uber's assertion that the General Assembly's adoption in 2015 of statutes specific to ride share network service providers supports its argument that the Taxicab Regulation does not apply to Uber. See OCGA § 40-1-190 (2015) et seq.; Ga. L. 2015, p. 1262, 1265, § 3. According to Uber, the 2015 statutes indicate that ride share network service providers did not exist in 1991 and were distinct from transportation service providers addressed in the Taxicab Regulation. However, the ride share network service providers statutes say nothing about excusing Uber from sales tax. See OCGA § 40-1-190 et seq. Moreover, our duty is to construe the plain language of the Taxicab Regulation as written, not speculate about the legislative intent behind the passage of the 2015 ride share network service providers statutes.

Ga. Comp. R. & Regs. r. 560-12-2-.84 (7) (b). A person or entity meeting the regulatory definition of "headquarters operator" must register as a dealer and remit the tax collected by its drivers on fares of transportation of persons to the State Revenue Commissioner. Ga. Comp. R. & Regs. r. 560-12-2-.84 (4), 7 (b).

Uber's main argument is that its apps do not meet the definition of a "headquarters" because that term requires a physical building or location, as opposed to the virtual functionality of an app. As stated previously, the first rule of regulatory construction is for the court to look to the plain language of the provision in question to determine its meaning. See *New Cingular Wireless PCS v. Ga. Dept. of Revenue*, 303 Ga. 468, 471-472 (2) (813 SE2d 388) (2018). If the regulatory text is clear and unambiguous, the court's search for intent is at an end, *Deal*, 294 Ga. at 173 (1) (a), and the court does not defer to an agency's interpretation unless it cannot determine the meaning,[11] *Barrow*, 305 Ga. at 802 (2). As the Supreme Court has noted, "[a]

[11] Uber argues that the superior court "mechanically afforded deference to the Department's interpretation rather than exercising independent judgment in deciding whether the Department acted within its statutory authority." (Citation and punctuation omitted.) According to Uber, the superior court's finding that the Taxicab Regulation was presumptively valid because it was not unreasonable "is a far too deferential standard and in conflict with Georgia precedent." However, while the superior court improperly cited the weight that should be afforded an administrative interpretation of a regulation, its statement that "[d]uly-enacted regulations are

statute or regulation is not ambiguous merely because interpreting it is hard[,]" and "[a]fter using all tools of construction, there are few statutes or regulations that are truly ambiguous." Id. at 803-804. Contrary to Uber's assertions, we conclude that the word "headquarters" as used in the Taxicab Regulation is not ambiguous and includes Uber's apps.

Uber correctly points out that statutory or regulatory terms are taken to mean what those terms meant at the time the statute or regulation was enacted. In 1991, when the Taxicab Regulation was amended to include the "headquarters operators" language, a "headquarters" was not only defined as a place or location, but also as "[a] center of operations or administration[,]" American Heritage Dictionary of the English Language, Third Edition, p. 832 (1992), or "the administrative center of an enterprise[,]" Webster's Ninth New Collegiate Dictionary, p. 558 (1991). These definitions do not require a physical place, but refer to a nexus of activity, a functional

---

presumed valid and may only be disturbed where the Court finds they either lack statutory authorization or are unreasonable" is a correct statement of the law. See, e.g., *Ga. Dept. of Revenue v. Ga. Chemistry Council*, 270 Ga. App. 615, 616 (607 SE2d 207) (2004). In addition, the superior court's order indicates that it applied the correct standard in exercising its independent judgment to determine that the Taxicab Regulation's application to Uber "is valid and supported by adequate statutory authority[.]"

rather than physical definition. This interpretation is not, as argued by Uber, "ubiquitous in the law and ordinary usage." In fact, this interpretation of the word "headquarters" correctly reflects the plain language of the statute, which defines the phrase "headquarters operators" in terms of their actions rather than a physical location. For example, a "headquarters operator" supervises or directs cars for hire drivers or receives and relays calls to cars for hire driver members. Ga. Comp. R. & Regs., r. 560-12-2-.84 (7) (b).

This interpretation also comports with the stated intent of the Taxicab Regulation: to shift the collection and payment of sales and use tax "on fares for transportation of persons" from the individual driver to "headquarters operators" "[d]ue to the likelihood that the State would otherwise lose tax funds due to the difficulty of policing the business operations of taxicab drivers because of the nature of the business, *the lack of an office or regular place of business* and the turnover of drivers[.]" (Emphasis supplied.) Ga. Comp. R. & Regs., r. 560-12-2-.84 (7) (b); see also *Collins*, 261 Ga. at 306 (1) (noting that the Taxicab Regulation was amended to include the "headquarters operators" collection requirement because the Department "recognized the need to collect the tax on fares for transportation of persons; the vital

30

role in the collection of the tax played by the taxicab driver; and the impossibility or impracticability, due to the nature of the business operations of taxicab drivers, of the State to collect the tax from the individual drivers"). In fact, the operation and very nature of ride share network service providers poses even more of a likelihood that the State will lose tax funds due to the difficulty of policing the collection of sales tax from a changing cast of thousands of independent drivers. Those drivers are largely transient, as they are not employees. As operators of cars for hire, those drivers likely have no regular place of business for recordkeeping and they are engaged in a service business. In contrast, Uber controls an automated electronic flow of funds between drivers and riders and could easily collect sales tax from its individual drivers to pay to the State Revenue Commissioner, which is exactly why the Taxicab Regulation exists.

Uber, by its own admission, "contract[s] with [d]rivers to help facilitate their sale of transportation services by providing the electronic infrastructure to bring [r]iders and the [d]rivers together." Accordingly, while Uber's technology may operate from the cloud or some esoteric, virtual location, the Uber apps themselves are the administrative center or central nexus from which Uber's functions are

performed and its business operates, meeting the broad definition of a headquarters in the context of the relevant sales tax regulation.

Having concluded that the Uber app meets the definition of a "headquarters," we must address the other requirements of the "headquarters operators" definition to determine whether Uber was required to comply with the Taxicab Regulation during the audit period.

(c) *Additional requirements of a "headquarters operator."* We turn first to the definition of a "headquarters operator" as a person or entity (i) supervising or directing cars for hire drivers, or (ii) receiving and relaying calls to cars for hire driver members. Ga. Comp. R. & Regs. r. 560-12-2-.84 (4), 7 (b). Uber's entire business model is based on receiving and relaying calls. Uber riders and drivers can only connect by using the Uber apps on their phones. The Uber app receives ride requests (or "calls") from prospective riders to find nearby ride share drivers, and Uber tracks both the riders' and drivers' locations within the app to relay those requests to the nearest ride share driver utilizing the app at that time. If a ride request is accepted by a driver, the prospective rider's pickup location is shared with the driver, resulting in the driver moving to the pickup location. Essentially, the Uber app functions as a

human dispatcher, receiving and relaying calls and directing drivers to nearby riders. Without the Uber app and Uber's technological dispatch, drivers would not know that riders exist. Thus, Uber, through its proprietary app, operates as an entity "receiving and relaying calls to [cars for hire] driver members[,]" Ga. Comp. R. & Regs., r. 560-12-2-.84 (4), meeting one of the two disjunctive definitions of "headquarters operators." As the plain language of Ga. Comp. R. & Regs., r. 560-12-2-.84 (6), as well as *Collins* and *Curry* hold, the "dispatch provisions" of the Taxicab Regulation apply to "cars for hire" as well as taxicabs, and "cars for hire" may be independently owned and driven by non-employees of the headquarters that dispatch them. *Collins*, 261 Ga. at 305-307 (1); *Curry*, 361 Ga. App. at 629-631 (1).

The Uber app also supervises and directs cars for hire drivers under the plain language of the Taxicab Regulation. It is undisputed that only drivers meeting Uber's requirements may use the Uber app, and if a driver violates Uber's terms of service, he can be terminated from the platform. Thus, Uber essentially supervises its drivers. In addition, while Uber does not tell drivers when to work, where to work, whether to pick up a certain rider, or how to perform their driving duties, the sequence of events surrounding the app receiving and relaying calls constitutes directing cars for

hire under the plain language of the Taxicab Regulation. In 1991, when the "headquarters operators" language was added to the Taxicab Regulation, the word "direct" could be defined as "[t]o cause to move toward a goal" or "[t]o cause to move in or follow a straight course[.]" American Heritage Dictionary of the English Language, Third Edition, p. 527 (1992); see also Webster's Ninth New Collegiate Dictionary, p. 358 (1991) (defining "direct" as "to cause to turn, move, or point undeviatingly or to follow a straight course" or "to show or point out the way for"). It is undisputed that Uber drivers move to the location of Uber riders because of the Uber app.

We further find that Uber meets the second disjunctive definition of "headquarters operator" under the Taxicab Regulation: a person or entity (i) "allowing use of the trade name of the headquarters[,]" or (ii) "allowing any driver to hold himself out as being associated with the headquarters." Ga. Comp. R. & Regs. r. 560-12-2-.84 (4), 7 (b). Uber drivers did not have an automobile decal during much of the audit period and, because Uber drivers used unmarked private vehicles to pick up riders, Uber riders necessarily had to rely on driver information provided in the Uber app or the Uber driver to confirm that they were entering the correct vehicles.

This is tantamount to Uber drivers holding themselves out as associated with Uber under the Taxicab Regulation. Although Uber drivers act independently, as our Supreme Court found,

> [t]hat a driver may be an independent contractor does not mean he is an independent [cars for hire] operator, individually responsible for remittance of the tax on fares to the State Commissioner, since "independent [cars for hire] operator" is defined in the regulation as "a person totally unassociated with any headquarters operation and with any lessors of [cars for hire] and with any other [cars for hire] business or driver." Reg. 560-12-2-.84 (7) (a).

*Collins*, 261 Ga. at 307 (1), n. 3.

(d) *Marketplace facilitator*. Uber argues that the Taxicab Regulation does not apply to it by pointing out that in 2020 the General Assembly amended OCGA § 48-8-30, the statute addressing the imposition, rate, and collection of sales tax, to require a "marketplace facilitator" to collect sales tax on behalf of a "marketplace seller" using its marketplace.[12] OCGA § 48-8-30 (c.2); Ga. L. 2020, pp. 1, 2-4, §§ 2-3. This

---

[12] The amended statutory scheme defines a "[m]arketplace facilitator" as: "[A] person that contracts with a seller in exchange for any form of consideration to make available or facilitate a retail sale that is taxable under this chapter on behalf of such seller by directly or through any agreement or arrangement with another person[.]" OCGA § 48-8-2 (18.1); Ga. L. 2020, p. 1, § 1.

amendment applies to all sales occurring after April 1, 2020. Ga. L. 2020, pp. 1, 4, § 3. According to Uber, it is a marketplace facilitator and drivers using its app are marketplace sellers; when the law became effective it began collecting sales tax and remitting that tax to the Department on rides provided by drivers using the driver app in Georgia. Uber argues that if the Department could have overridden the limitation in OCGA § 48-8-30 (f) (1) based on the Taxicab Regulation, then there was no need to enact the 2020 marketplace facilitator legislation. See generally *Bd. of Assessors v. McCoy Grain Exchange*, 234 Ga. App. 98, 100 (505 SE2d 832) (1998) ("[W]hen a statute is amended, from the addition of words it may be presumed that the legislature intended some change in the existing law.") (citation and punctuation omitted). We find no merit in this argument.

Pretermitting whether Uber can be considered a marketplace facilitator, the General Assembly in 2020 also repealed the imposition of sales tax on "any for-hire ground transport trip" and, in its place, imposed a per-ride excise tax[13] that "shall be

---

[13] Excise taxes, unlike sales taxes, are usually a fixed amount per unit or transaction; they are essentially a transaction tax "imposed upon the performance of an act, engaging in an occupation, or the enjoyment of a privilege." *Head v. Cigarette Sales Co.*, 188 Ga. 452, 457 (2) (4 SE2d 203) (1939).

collected and remitted by the for-hire ground transport service provider itself and not the vehicle driver."OCGA §§ 48-8-3 (25), 48-13-141 (a); Ga. L. 2020, pp. 903, 904-905, §§ 2-1, 2-2. OCGA § 48-13-141 (a) provides, in pertinent part:

> On and after April 1, 2020, an excise tax in the amount of 50¢ shall be levied upon any for-hire ground transport trip and 25¢ upon any shared for-hire ground transport trip. Such excise tax shall be collected and remitted by the for-hire ground transport service provider itself and not the vehicle driver. . . .

A "for-hire ground transport service provider" is defined in OCGA § 48-13-140 (1) as "a limousine carrier, ride share network service, taxi service, and transportation referral service as such terms are defined in Code Section 40-1-190[,]"and Code Section 40-1-190 (4) defines a "ride share network service" as "any person or entity that uses a digital network or Internet network to connect passengers to ride share drivers for the purpose of prearranged transportation for hire or for donation." Accordingly, whether Uber can be considered a marketplace facilitator is irrelevant because the new excise collection statute on its face applies to all for-hire ground

transport service providers, which would include ride share network service providers like Uber.[14]

(e) *Conclusion.* In short, "the interpretation of the administrative agency [in this case] correctly reflects the plain language of the [regulation] and comports with the legislative intent" of the Taxicab Regulation. (Citation and punctuation omitted.) *Handel*, 284 Ga. at 553. Uber meets the definition of a "headquarters operator" as defined by the Taxicab Regulation and, therefore, Uber was required during the audit period to collect sales tax from its independent drivers and remit that tax to the Department.[15]

---

[14] While we need not decide in this case whether Uber can be considered a marketplace facilitator, we note that the new excise collection statute on its face demonstrates an intent by the legislature to treat ride share network service providers separately from marketplace facilitators, exempting them from sales tax for rides and instead imposing a new excise tax.

[15] In its amicus curiae brief, the Metro Atlanta Chamber asserts that application of the Taxicab Regulation to Uber gives unfettered policy-making authority to the Department and "may enable and embolden the Department of Revenue to arbitrarily reach beyond the bounds of its statutory authority and impose errant assessments on more Georgia businesses." While the superior court's inadvertent use of the phrase "plenary authority" when addressing OCGA § 48-2-12 (a) may be construed as broadly giving the Department an unfettered and unprecedented ability to make any rule or regulation involving taxes, the superior court's order properly limits this power to "reasonable rules and regulations not inconsistent with this title or other laws or with the Constitution of this state or of the United States for the enforcement of this

9. *Internet Tax Freedom Act.* Finally, in a very brief argument, Uber asserts that requiring it to collect sales tax "shifts the sales tax collection obligation from the person 'furnishing' the service to Uber [and] violates the federal Internet Tax Freedom Act[,]" 47 USC § 151. Specifically, Uber argues that shifting the tax collection obligation to it is discriminatory pursuant to ITFA §§ 1101 (a) (2) and 1105 (2) (A) (iii). According to Uber, the order "must be reversed to avoid a constitutional preemption problem."

Pretermitting whether a federal preemption argument might subject this appeal to the Supreme Court's constitutional-question jurisdiction, the record does not indicate that Uber raised — or that any lower tribunal directly addressed — a preemption argument. See *Williams v. Regency Hosp. Co.*, 318 Ga. 145, 147 (897 SE2d 466) (2024) (holding that to invoke the Supreme Court's constitutional-question jurisdiction, "the constitutional question must have been raised and distinctly ruled upon in the trial court").

---

title and the collection of revenues under this title." OCGA § 48-2-12 (a). Moreover, our conclusion that the Taxicab Regulation applies to Uber is based on the plain language of the Taxicab Regulation and our appellate courts' application of that regulation. Our opinion is limited to the application of the Taxicab Regulation to Uber, as a headquarters operator for cars for hire, and does not expand the regulation's interpretation in such a way as to violate the separation of powers.

The ITFA creates a moratorium prohibiting individual states from imposing, among other things, discriminatory taxes on electronic commerce. Section 1101 (a) (2). The term "discriminatory tax" is defined as

> any tax imposed by a State or political subdivision thereof on electronic commerce that —

> (i) is not generally imposed and legally collectible by such State or such political subdivision on transactions involving similar property, goods, services, or information accomplished through other means;

> . . .

> (iii) imposes an obligation to collect or pay the tax on a different person or entity than in the case of transactions involving similar property, goods, services, or information accomplished through other means[.]

Section 1105 (2) (A) (i), (iii). Even if the ITFA applies in this case, Uber has failed to show that requiring it to collect sales tax under the Taxicab Regulation constitutes a discriminatory tax. Because we have concluded that Uber was properly taxed in Georgia as an entity that is a "headquarters operator" under the Taxicab Regulation,

in the same manner as taxi and limousine headquarters operators, its ITFA argument based on discrimination fails.

*Judgment affirmed. McFadden, P. J., and Pipkin, J., concur.*